ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JAN 2 2 2004
U.S. COURT OF FEDERAL CLAIMS

**INTERSTATE POWER AND LIGHT COMPANY**
Alliant Energy Tower
200 1st St., Southeast
Cedar Rapids, IA 52401

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

No.: 04-0067C

Judge:__________

**COMPLAINT**

Plaintiff, Interstate Power and Light Company ("IPL"), through undersigned counsel, files this Complaint against the Defendant, the United States of America, acting through the United States Department of Energy ("DOE"), and states as follows:

1. This is an action for breach of contract and taking of property without just compensation. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), the DOE entered into a written contract, known as the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Waste (the "Contract" or "Standard Contract"), with the majority owner and operator of the Duane Arnold Energy Center ("DAEC") on June 17, 1983. Pursuant to the terms of the Standard Contract, the Government was to begin accepting and disposing of spent nuclear fuel and high level waste (collectively for these purposes, "SNF") generated by DAEC on or before January 31, 1998, in exchange for agreed payments fixed in the

Standard Contract at particular amounts. IPL honored all of its contractual obligations under the Standard Contract. The Government has breached the Standard Contract by failing to accept SNF for disposal as required.

**JURISDICTION**

2. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1491(a)(1). This action is brought by Plaintiff within six years of the date of the breach, in accordance with 28 U.S.C. § 2501.

3. Plaintiff may seek damages without exhausting any administrative remedies because DOE's complete failure to begin acceptance and disposal of IPL's SNF is a partial material breach of the Standard Contract, and the claim does not "arise under" the Standard Contract. *Maine Yankee Atomic Power Co. v. U. S.*, 225 F.3d 1336 (Fed. Cir. 2000); *Northern States Power Co. v. U. S.*, 224 F.3d 1361 (Fed. Cir. 2000).

4. Furthermore, Article XI of the Standard Contract states, "nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Pursuant to this provision, Plaintiff is entitled to pursue its legal claims without exhausting any administrative remedies.

**PARTIES**

5. Interstate Power and Light Company is the majority owner and operator of DAEC and the holder of the Standard Contract at issue in this case. At the time the parties signed the Standard Contract in 1983, the name of the entity that was the majority owner and operator of DAEC was Iowa Electric Light and Power Company. Pursuant to a merger in 1993, the name of Iowa Electric Light and Power Company, which was the surviving corporation, was changed to IES Utilities Inc. Pursuant to another merger

effective in 2002, the name of IES Utilities Inc., which was the surviving corporation, was changed to Interstate Power and Light Company, which is the current name of the Purchaser under the DAEC Standard Contract. In August 2000, operating authority for the DAEC under the terms of its U.S. Nuclear Regulatory Commission license was transferred to the Nuclear Management Company, but IPL remains the majority owner of the DAEC and the Purchaser under the Standard Contract. Minority ownership interests in DAEC are held by Central Iowa Power Cooperative and Corn Belt Power Cooperative. IPL is authorized to act on behalf of the minority co-owners for these purposes.

6. Defendant is the United States of America, acting by and through the DOE. (Defendant may be referred to interchangeably in this Complaint as the United States, DOE, or the Government.)

## STATEMENT OF FACTS

7. Since enactment of the Atomic Energy Act of 1954, the Government has encouraged the development of commercial reactor technology in the United States. DAEC was developed and operated pursuant to a license issued by the Atomic Energy Commission, now the Nuclear Regulatory Commission ("NRC").

8. SNF is generated at DAEC as a byproduct of the operation of the reactor, and remains stored there now. SNF is composed, in significant part, of uranium and plutonium and other highly radioactive substances. SNF remains radioactive after it is removed from a nuclear reactor and must be isolated in safe disposal facilities for an indefinite period.

**The Government's Obligations Under the Standard Contract**

9. In 1982, Congress enacted the NWPA, codifying and confirming the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of civilian SNF. *See* 42 U.S.C. § 10101 *et. seq.* The NWPA provides that the "Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment," and that the generators and owners of SNF have the primary responsibility to provide for "the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by [DOE] in accordance with the provisions of this Act." 42 U.S.C. § 10131(a)(4) and (5).

10. Pursuant to Section 302 of the NWPA (42 U.S.C. § 10222), the Government in 1983 developed the Standard Contract. The Standard Contract prescribes the payment of certain fees into the Nuclear Waste Fund based on specified criteria, primarily megawatts-electric ("MWe") generated, and the acceptance and disposition of SNF by the Government. *See* 10 C.F.R. § 961.11. Reactor operators were required to enter into these Contracts or risk losing their NRC operating licenses.

11. DOE entered into the DAEC Standard Contract at issue here in 1983.

12. Article IV of the Standard Contract sets out the Responsibilities of the Parties. Section A of Article IV establishes the Purchaser's Responsibilities, including payment of certain fees.

13. IPL has fully complied with all of its obligations under the Standard Contract, including the payment of required fees.

14. The Standard Contract for DAEC obligates the Government to commence acceptance and disposal of SNF by January 31, 1998 in accordance with the priority established by DOE. *E.g.,* Standard Contract Art. II, Art. IV.B.5(a).

15. The Standard Contract provided that the DOE was to begin accepting SNF no later than January 31, 1998 and to continue "until such time as all SNF and/or HLW [high level radioactive waste] from the civilian nuclear power reactors ... has been disposed of." Standard Contract, Art. II.

**DOE's Partial Material Breach of the Standard Contract**

16. An important element of the NWPA was the initial development of waste disposal facilities according to a firm and fixed schedule.

17. In late 1993 and early 1994, DOE began to take actions both recognizing that it would not meet the January 31, 1998 deadline for acceptance of SNF, and tentatively asserting it may have no obligation to meet that deadline absent an operational repository or other facility.

18. In a joint letter to DOE, dated November 19, 1993, a number of utility, regulatory, and state officials requested that DOE address its responsibilities for accepting and disposing of SNF.

19. On May 25, 1994, DOE published a Notice of Inquiry ("NOI") to elicit views of affected parties on matters relating to the continued storage of SNF at reactor sites beyond 1998. *See* 59 *Fed. Reg.* 27,007 (1994). DOE noted in its NOI its "preliminary view" that it had no statutory obligation to accept SNF by the 1998 deadline in the absence of an operational repository or other facility constructed under the Act.

20. On April 28, 1995, DOE completed the NOI process by issuing its "Final

Interpretation." The Final Interpretation proceeded from the premise that DOE would not be able to begin accepting SNF by the January 31, 1998 date established in the Act. *See* 60 *Fed. Reg.* 21,793 (1995). Instead, DOE announced "that it does not have a legal obligation under . . . the Act . . . to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the [NWPA]." *Id.* at 21,794.

21. DOE's position was challenged by several utilities in a lawsuit brought before the United States Court of Appeals for the District of Columbia, which ruled that the NWPA imposed an unconditional obligation on DOE to begin accepting SNF on or before January 31, 1998. *See Indiana Michigan Power Co. v. U. S. Dept. of Energy,* 88 F.3d 1272 (D.C. Cir. 1996).

22. In response to the *Indiana Michigan* decision, on December 17, 1996, DOE issued a letter to Standard Contract holders stating: "Pursuant to Article IX of the Standard Contract, this letter is to advise you that DOE anticipates that it will be unable to begin acceptance of SNF for disposal in a repository or interim storage facility by January 31, 1998." DOE subsequently stated that "this delay was due to circumstances beyond the reasonable control of DOE and therefore the anticipated delay was 'unavoidable' within the meaning of Article IX of the Standard Contract."

23. On January 31, 1997, a number of utilities filed a petition with the D.C. Circuit for a Writ of Mandamus to compel DOE to comply with the mandate in *Indiana Michigan*.

24. On June 3, 1997, while the mandamus proceeding was pending, DOE issued a Preliminary Determination that DOE's delay in beginning SNF disposal was "unavoidable."

25. On November 14, 1997, the D.C. Circuit issued its decision in *Northern States Power Co. v. U. S. Dept. of Energy,* 128 F.3d 754 (D.C. Cir. 1997) in response to the Writ of Mandamus filed by utilities, and rejected DOE's June 3, 1997 Preliminary Determination.

26. The Court in *Northern States Power* expressed dissatisfaction with DOE's response to the *Indiana Michigan* decision. The Court stated:

> After issuing our decision in *Indiana Michigan*, we would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so. Quite the contrary. . . The contractual obligations created consistently with the statutory contemplation leave no room for DOE to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress...We held in *Indiana Michigan* that the NWPA imposes an unconditional duty on DOE. . . to assume an unqualified obligation to take the materials by the statutory deadline.

*Id.* at 757 - 760.

27. The Court refused to accept DOE's defense of unavoidability, finding the defense merely a recycled argument which had been previously rejected by the Court in *Indiana Michigan*.

28. The Court invalidated DOE's interpretation of the "unavoidable delays" clause because it would "absolve itself from bearing the costs of its delay if the delay is caused by the government's own acts." *Id.* at 760.

29. The Court, in applying the mandamus test, did not grant all of the relief requested by petitioners. While the Court found that there was a clear right to relief and a clear duty to act, it also found that the Standard Contract presents "another potentially

adequate remedy." *Id.* at 759. The Court held that the petitioners must, in the first instance, pursue contract-based remedies.

30. A number of Standard Contract holders have filed and pursued lawsuits against the DOE in this Court.

31. On August 31, 2000, the United States Court of Appeals for the Federal Circuit issued companion decisions in *Maine Yankee Atomic Power Co. v. U. S.*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power Co. v. U. S.*, 224 F.3d 1361 (Fed. Cir. 2000), effectively holding that the DOE is liable for breach of the Standard Contract and that claims for damages should be pursued through lawsuits in the Court of Federal Claims. In these opinions, which resolved divergent holdings of two Court of Federal Claims judges and became final in December 2000, the Federal Circuit concluded that claims against DOE in these circumstances do not "arise under" the contracts, and may therefore be brought directly in court.

32. The rationale, articulated in the *Maine Yankee* decision, was that the DOE's across-the-board failure to begin taking fuel was not a "delay" as that term is used in the Standard Contract. Rather, the "delay" term of the Standard Contract contemplates the sort of routine delays one might expect to arise in connection with acceptance of fuel from individual utilities, *i.e.*, after programmatic performance by the DOE had commenced.

33. The Federal Circuit's *Northern States Power* decision adopted the rationale of the *Maine Yankee* decision on the jurisdictional issue, reversing the lower court. It also reiterated the unconditional obligation of the DOE as expressed by the D.C. Circuit, and accordingly affirmed the ruling in plaintiff's favor on liability for breach of contract.

34. January 31, 1998, came and went without DOE accepting any SNF from any Standard Contract holder, including IPL.

35. DOE continues to refuse to provide a firm date for commencing the disposal of IPL's SNF.

**Damages to Plaintiff Caused by DOE's Partial Material Breach**

36. Plaintiff has complied with its obligations under the Standard Contract but has not received DOE's promised performance. DOE's partial material breach of its statutory and contractual obligations has required Plaintiff to take actions, at substantial cost, to maintain the SNF at DAEC.

37. IPL has incurred, and will continue to incur, substantial damages related to costs associated with the storage of SNF, as a direct and proximate result of Defendant's breach.

## CLAIMS FOR RELIEF

## COUNT I

**(Partial Material Breach of Express Written Contract)**

38. Plaintiff repeats and re-alleges paragraphs 1 through 37 above.

39. The Standard Contract is a valid and binding contract between Plaintiff and Defendant.

40. The Standard Contract required Defendant to commence accepting SNF on or before January 31, 1998.

41. Plaintiff has complied and continues to comply with all of its obligations under the Standard Contract.

42. Defendant, which has an unconditional obligation to commence accepting SNF by January 31, 1998, has not accepted any SNF from Plaintiff.

43. Defendant's failure to perform the services contemplated by the Standard Contract on or before January 31, 1998 constitutes a partial material breach of the Standard Contract by Defendant.

44. Plaintiff has incurred, and will continue to incur, significant damages as a direct and proximate result of Defendant's partial material breach of the Standard Contract.

45. As a direct and proximate result of Defendant's partial material breach, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

**COUNT II**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

46. Plaintiff repeats and re-alleges paragraphs 1 through 45 above.

47. The Standard Contract between Plaintiff and Defendant contains an implied covenant of good faith and fair dealing, pursuant to which Defendant has a duty to perform its obligations under the Contract in good faith and not to take actions detrimental to Plaintiff's contractual rights. Defendant has breached the covenant of good faith and fair dealing by failing and refusing to take reasonable steps to meet the contractual deadline for beginning to dispose of SNF; by consistently attempting to avoid its obligations under the Contract as defined by the D.C. Circuit; and by failing to take steps that it could have taken to dispose of Plaintiff's SNF or even to provide Plaintiff with a firm date on which Defendant will begin to do so.

48. Defendant's failure to act has not been the result of technical inability, as evidenced by the fact that Defendant has accepted and stored SNF from foreign research reactors. Further, Defendant's failure to act has not been the result of legal impediment, as Courts have held that Defendant cannot cite legal impediments to avoid liability. *See Northern States Power Co.*, 128 F.3d 754 (D.C. Cir. 1997). Finally, Defendant cannot

cite inadequate resources as there are ample funds available in the Nuclear Waste Fund that would allow the Government to comply with its contractual obligations.

49. In contrast to Defendant's failure to take any action to meet its contractual commitments to Plaintiff, Defendant has taken action to receive, transport and store SNF from other entities. For example, Defendant has accepted and stored SNF from domestic and foreign research reactors.

50. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and will continue to suffer damages as alleged above.

## COUNT III

### (Taking Without Just Compensation of Real Property)

51. Plaintiff repeats and re-alleges paragraphs 1 through 50 above.

52. The Government was and is unequivocally obligated to commence acceptance and disposal of IPL's SNF.

53. The Government's failure to honor its commitments was, and continues to be, unnecessary and extraordinary.

54. The Government's failure and refusal to comply with its obligations for acceptance and disposal of IPL's SNF has deprived, and will continue to deprive, IPL and its co-owners of the full value and economic use of the real property on which the SNF is stored at DAEC.

55. By reason of the foregoing, Defendant's failure to dispose of IPL's SNF amounts to a Fifth Amendment taking of Plaintiff's real property on which DAEC is located, without just compensation. Plaintiff is entitled to just compensation for this taking in an amount to be established at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Interstate Power and Light Company respectfully requests that the Court enter judgment in its favor and against Defendant, the United States, in an amount to be determined in further proceedings, together with such additional costs, fees, and other relief as the Court may deem just and appropriate.

January 22, 2004

Respectfully submitted,

Brad Fagg (Counsel of Record)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-5191 – Telephone
(202) 739-3001 – Facsimile

Of Counsel:
Paul M. Bessette
MORGAN, LEWIS & BOCKIUS LLP

Attorneys for Plaintiff
Interstate Power and Light Company

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INTERSTATE POWER AND LIGHT COMPANY<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No.: 04-0067C<br><br>Judge:__________ |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to RCFC 7.1, Plaintiff, Interstate Power and Light Company, through undersigned counsel, respectfully submits this corporate disclosure statement. Interstate Power and Light Company is a wholly-owned subsidiary of Alliant Energy Corporation. Alliant Energy Corporation is a publicly held corporation and owns more than 10% of Interstate Power and Light Company.

January 22, 2004

Respectfully submitted,

Brad Fagg (Counsel of Record)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-5191 – telephone
(202) 739-3001 – facsimile

Of Counsel:
Paul M. Bessette
MORGAN, LEWIS & BOCKIUS LLP

Attorneys for Plaintiff,
Interstate Power and Light Company